**LUMANA'I SAUFO'I and TAUSISI'I SAUFO'I, Plaintiffs**

**v.**

**AMERICAN SAMOA GOVERNMENT, CONTINENTAL INSURANCE, FATA HOLT, and KILISI PAULI, Defendants**

High Court of American Samoa
Trial Division

CA No. 3-88

January 24, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala'ilima
For Defendant American Samoa Government, Arthur Ripley Jr., Assistant Attorney General
For Defendants Continental Insurance, Fata Holt, and Kilisi Pauli, Roy J.D. Hall Jr.

15

On April 10, 1987, plaintiffs' four-year-old daughter was struck by a bus and killed. This action is against the driver, the owner, and the insurer of the bus and also against the American Samoa Government (hereinafter "ASG") in its capacity as proprietor of the pre-school program the child was attending on the day of the accident.

The child, Ballerina Saufo'i, was enrolled in an ASG pre-school program called Early Childhood Education (ECE). The classes in which Ballerina was enrolled were held in a home uphill from Evalani's Cabaret Lounge in the village of Pago Pago. Access to this home is by way of a steep path and stairway beginning on the main road beside Evalani's.

In an effort to assure the safety of children attending ECE classes, ASG had given all teachers instructions that no student was to be allowed into a class unless accompanied to the door by a parent or other adult. Teachers were specifically prohibited from agreeing with parents that they themselves would undertake the responsibility of seeing children to and from school. These instructions had been communicated to Salilo Scanlan, who was Ballerina's ECE teacher.

Despite these instructions, Ms. Scanlan made an arrangement with plaintiffs, to whom she is related, according to which she took Ballerina to and from most ECE classes.

On April 10, 1987, the day of the accident, Ms. Scanlan had taken Ballerina to school. She had also dismissed her ECE class early that day so that she could take her own child to a medical appointment. The early dismissal, which was undertaken on Ms. Scanlan's own authority in contravention of general ECE policy, had been announced to parents that morning as they brought their children to class. At the time of the accident all but four of the children had been picked up. The four who remained were Ballerina; plaintiffs' other daughter; Ms. Scanlan's own child; and another child whose parents had not yet come for him. Ms. Scanlan was cleaning up and putting away ECE materials as ECE rules required her to do. In the course of this activity she went into another room. Upon her return she found Ballerina gone.

Defendant Kilisi Pauli, according to his testimony, was driving his bus on the main road at a speed of about fifteen miles per hour. His testimony is to the effect that he did not see Ballerina before the moment of impact. He testified that the point of impact was somewhere on the right side of the bus, and that she was thrown forward and to the side.

16

The only other eyewitness, Sefo Etuale, apparently did not have a very good view of the accident. He testified that he saw someone get hit by a vehicle about ten cars ahead of him and that the person was thrown to the side. He could provide no further details, not even the type of vehicle that was involved in the accident.

Ballerina was taken to the hospital where she was pronounced dead upon arrival.

Police officers arrived upon the scene a few minutes later. The officers found a large bloodstained area on the road near the stairs that lead to the ECE center. The bloodstained area is quite close to the center line of the road, about nine feet from the mauga or right-hand shoulder and about fourteen feet from the sami or left-hand shoulder. The eyewitness testimony of the reporting officer and police photographs taken shortly after the accident reveal no evidence of any other significant bloodstains on the road. The bloodstained area, therefore, almost certainly marks either the point of impact or (more likely) the point at which Ballerina's body came to rest and lay until it was carried away. In either case the point of impact was at or near the middle of the road.

The police officer also observed that the accident had occurred at about 10 a.m. and that it was daylight, the weather was clear, and the road was dry.

Counsel for defendant Pauli argues that this case is governed by our decision in *Matalolo v. Penitusi*, 4 A.S.R.2d 46 (1987) in which we observed that "the mere fact that a vehicle strikes a pedestrian does not give rise to strict liability without fault, or even to a responsibility on the part of the defendant to prove that he was not negligent." *Id.* at 47.

In *Matalolo* the plaintiff, whose child had been injured when hit by a car, testified that her child stepped out from behind a bus and was hit by the car. We found that "[t]he point of collision with defendant's vehicle was at the extreme right end of the front of the vehicle, indicating that the child stepped into the road at the last possible moment before impact." *Id.* at 46. Under these circumstances, and in the absence of any other evidence that the driver had been negligent, we held that there was no showing of negligence.

This case, however, is not *Matalolo*. In that opinion we pointed out that the law does not automatically hold the driver at fault in every automobile/pedestrian collision. We did not mean to imply that judicial

17

inquiry into every such collision ---or into every collision that results in the death of one of the two people in the best position to observe what happened --- should begin and end with the survivor's recollection that the decedent just suddenly ran into the side of the car. Indeed, we began our analysis in *Matalolo* with the observation that "[t]he defense of 'he darted into the road at the last minute' is often asserted but seldom proved.'" 4 A.S.R.2d at 47.

In the present case this assertion is at odds with the physical evidence, which is the most reliable evidence we have. If, as the driver testified, he was driving in the right lane, and if Ballerina had run into the side of the bus and had been thrown toward the right side of the road, then blood or other evidence of the presence of a fatally injured person should have been located near the far right edge of the roadway. That this evidence was found instead near the center line --- that is, in the leftmost portion of the lane in which the bus was being driven --- leads to two important distinctions between the facts of this case and those of *Matalolo*:

(1) It becomes difficult to believe the driver's testimony that the point of impact was on the right side of the vehicle, much less counsel's conclusion that "young Ballerina was killed as the result of an unavoidable accident when she ran, unexpectedly and with out warning, into the public highway thereby colliding with the side of the defendant's bus." Rather, the location of the bloodstain and the driver's testimony that he was driving entirely in the right lane would indicate that the child was hit squarely by the front of the bus, most likely the left front portion.[1]

(2) Even more important, and regardless of what part of the vehicle hit the child, the fact remains that she made it to the middle of the street without being seen by the driver. The police photographs taken on the day of the accident reveal that a person approaching the roadway

---

[1] The driver testified that he was driving somewhat further toward the center of the road than might otherwise have been the case, since road workers had placed cones near the rightmost edge of the roadway, but that he stayed in the right lane. The police photographs confirm the existence of the cones but show them extending only about two feet into the roadway. If the bus was in the right lane and if the bloodstain was anywhere near the point of impact, then Ballerina was struck by the left front portion of the bus.

 The police officers observed no damage to the bus from which the point of impact could be precisely determined. (Nor, contrary to the suggestion of defendants' counsel, was there any evidence that Ballerina ran rather than walked into the roadway.)

18

from the steps to the ECE center would first have to cross a small footbridge over a ditch by the roadside. The bridge and the shoulder together appear to be three or four feet wide; a person standing on the bridge or the shoulder, even a child, would be clearly visible to approaching motorists. In *Matalolo* the child was hidden by a bus until the very moment he stepped out from behind the bus into the path of an oncoming car. In the present case the child was clearly visible to oncoming motorists for *at least* the time it takes a four-year-old child to negotiate the bridge, the shoulder, and nine feet of roadway.[2] It is hardly strict liability to find that a driver who fails to observe a child as she crosses a footbridge as well as the shoulder and almost the entire right lane of a public highway, all in broad daylight, is probably not looking carefully enough.

This is not to say, of course, that defendant Pauli was solely responsible for the accident. The evidence does not suggest that he was guilty of such gross negligence that the accident might not have been avoided by the exercise of due care on the part of some other person or persons. It does suggest that he was not looking carefully at the road ahead of him and that this contributed to the accident.

Accordingly, we hold that the evidence preponderates in favor of plaintiffs' claim that defendant Pauli was negligent in failing to keep a proper lookout. Defendant Fata Holt, who has admitted being the owner of the commercial vehicle driven by Pauli and the holder of the commercial vehicle license and has not denied plaintiffs' allegation that she employed him to operate the vehicle, is therefore vicariously and secondarily liable for the negligence of defendant Pauli. Defendant Continental Insurance Company, which admits being the insurer of the vehicle at the time of the accident, is liable in such capacity for the negligence of the driver.

Plaintiffs also claim that defendant ASG is responsible for the death of their daughter. They argue that ASG was negligent in placing the ECE center in a high traffic area without taking special precautions such as the installation of traffic safety devices, and that ASG is also

---

[2] It also appears from the photographs that an oncoming driver, at least one with the relatively high vantage point of a bus driver, would have been able to see over some intervening foliage so as to observe the child even earlier, as she came down the stairs leading to the roadway.

19

liable for the negligence of its employee, Salilo Scanlan, in allowing Ballerina to wander away from the ECE program.

The evidence does not support plaintiffs' contention that ASG was negligent in its placement of the ECE center. Forced to choose between having early childhood education classes in private homes or not having them at all, ASG adopted a variety of safeguards --- very small class sizes, limitation of enrollment to children living in the immediate neighborhood, and especially the rule that parents must drop off and pick up their children from each class --- to minimize traffic safety problems. These measures, although tragically unavailing in the present case, would appear in general to be at least as effective as the designation of each ECE center as a school and posting of the surrounding area as a school zone. (In the present case, moreover, it is not at all clear that the absence of a school zone sign or similar warning device was a cause in fact of the accident. Defendant Pauli testified that he knew there were sometimes young children in this area and that he was driving only fifteen miles an hour, somewhat slower than the usual limit in school zones.)

ASG is, however, liable for any negligence of Salilo Scanlan provided that such negligence occurred in the course and scope of her duty as an ASG employee.

Perhaps because Ms. Scanlan herself was not made a party to this case, no party has seriously disputed plaintiffs' contention that she was negligent. We are satisfied that she was indeed negligent in leaving children unattended a few steps from a busy roadway. ASG contends, however, that it cannot be held liable for Ms. Scanlan's conduct because she was not acting in her capacity as an ASG employee. Rather, she specifically violated her employer's instructions in pursuance of a private arrangement with her relatives, the plaintiffs themselves, which arrangement ASG regards as the sole means by which she contributed to Ballerina's death.

The position that an employee's defiance of her employer's instructions takes her outside the course and scope of her employment is not without attractions both equitable and metaphysical. It is, however, contrary to settled law:

> The fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining

20

what the servant has been hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment. . . . Thus, instructions to a sales clerk never to load a gun while exhibiting it will not prevent liability when the clerk does so, in an effort to sell the gun. If the other factors involved indicate that the forbidden conduct is merely the servant's way of accomplishing an authorized purpose, the master cannot escape responsibility no matter how specific, detailed and emphatic his orders may have been to the contrary.

W. Prosser & P. Keeton, The Law of Torts § 70 at 502-03 (5th ed. 1984) (footnotes omitted).

In the present case Ms. Scanlan had been hired to conduct a class whose students included Ballerina Saufoʻi. Although the negligence with which Ms. Scanlan is now charged occurred a few minutes after she had dismissed the class, it occurred at her place of work during her usual working hours. Although she was planning what was arguably a detour and frolic of her own, and had dismissed class early in anticipation of this personal errand, at the time of the accident she was still at her place of work performing at least two of her duties as an ASG employee: cleaning up after class and waiting for the parents of one of her students to come for him.

Although Ms. Scanlan's contribution to the accident was clearly related to her agreement with Ballerina's parents, it was also clearly related to her performance of the duties required of her by ASG. When Ms. Scanlan left the room just before the accident she did so in pursuance of her duty to clean up after class. That her particular way of doing this (leaving children unattended) was contrary to her employer's wishes, or that she violated her employer's specific instructions by mixing her dual roles as ECE employee and private agent for Ballerina's parents, cannot avoid the fact that her negligence occurred when she was acting at least partly in her role as an ECE employee.

Nor, however, can Ms. Scanlan's connection with ASG relieve the plaintiffs of their own responsibility for the arrangement that contributed to the accident. It appears that they knew this arrangement was against the rules. Moreover, the plaintiffs knew as well as defendant ASG that the ECE center was located just uphill from the main road at a place where there was heavy traffic, and they had even more reason

21

than ASG to be familiar with the strengths and weaknesses of their relative, Ms. Scanlan. Their entrustment to her of their child's safety during the period after classes were over, when they knew or had reason to know she would be attempting to combine this grave responsibility with her responsibilities to her employer, was a factor that contributed substantially to the accident.

Apportioning the negligence of the various parties in accordance with A.S.C.A. § 43.5101, we find the accident to have been caused by two equally culpable courses of conduct. One of these was the failure of defendant Kilisi Pauli to keep a proper lookout. The other course of conduct consisted of two elements: the agreement by which Ms. Scanlan was to care for Ballerina after class, and her leaving the children unattended just before the accident. The first of these elements represents negligence attributable to the plaintiffs; ASG is vicariously liable for the second element. We therefore assess liability at 50% for Pauli, his employer, and his insurer; 25% for ASG; and 25% for the plaintiffs.

Plaintiffs describe their damages as consisting almost entirely of "emotional distress." Construing the pleadings liberally in order to do justice, we assume plaintiffs mean to assert their rights under A.S.C.A. § 43.5001 to recover for the wrongful death of their child. The statutory elements of such a claim include "pecuniary injury and loss of love and affection, including . . . loss of society, companionship, comfort, consortium, or protection; [and] loss of filial care and attention." *Id.* § 43.5001(c). We assess plaintiffs' damages, including the loss of love, affection, society, companionship, comfort, and possible future protection, support, care, and attention, at $40,000.

Plaintiffs also claim to have incurred medical expenses of $50 and funeral expenses of $3,945. The claim for medical expenses is allowed. Plaintiffs submitted no credible evidence either of the amount of funeral expenses or that such expenses were actually paid by the plaintiffs. The only evidence submitted was the testimony of plaintiff Lumana'i Saufo'i, who was clearly not telling the truth. Accordingly, no special damages are awarded for funeral expenses.

Damages are therefore assessed against defendants Kilisi Pauli, Fata Holt, and Continental Insurance Company in the amount of $20,025. Damages are assessed against defendant ASG in the amount of $10,012.50.

We note, however, that plaintiffs have not applied to the Court for recognition as the proper parties to bring this action. The wrongful death statute requires that an action "must" be brought on behalf of the surviving spouse, parents, children or other next of kin, if any, of the decedent "as the court may direct." A.S.C.A. § 43.5001(b). We have not thus far been asked to give the requisite directions. By allowing the case to be brought to trial and submitted for judgment, the various defendants would appear to have waived any objections to this defect in the pleadings. We are concerned, however, that by proceeding in their own names without asking for leave of court, plaintiffs may have prejudiced the rights of Ballerina's brothers and sisters. Plaintiffs are therefore directed to make the appropriate application immediately.

Formal entry of judgment will be delayed pending action on such application. The time period during which parties may move for reconsideration of the judgment will commence with formal entry of judgment.

It is so ordered.